# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **CHARLIE ABNEY et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:09-266-KD-N** |
| | ) | |
| **GENERAL ELECTRIC CO. and** | ) | |
| **BHA GROUP, INC.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## ORDER

Before the Court is Defendants General Electric Co. ("GE") and BHA Group, Inc. ("BHA")'s motion for summary judgment (Doc. 73), reply in support (Doc. 93), and suggestion of subsequently decided authority (Doc. 94); along with Plaintiffs' opposition to the motion for summary judgment (Doc. 83, 84, 85, 86, 87, 88, 89, & 92) and response to the defendants' suggestion of subsequently decided authority (Doc. 95). For the reasons set forth below, the motion for summary judgment is **DENIED**.

## I. Summary Judgment Standard

Summary judgment should be granted only if "there is no genuine issue as to any material fact and [ ] the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2).[1] The

---

[1] Rule 56(c)(2) of the Federal Rules of Civil Procedure, provides that summary judgment shall be granted:

> if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

FED. R. CIV. P. 56 (c).

party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The party seeking summary judgment also always bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted). The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Secretary of Dep't of Children & Family Serv., 358 F.3d 804, 809 (11th Cir. 2004), cert. den., 534 U.S. 1081 (2005).

## II. Background Facts[2]

### A. General

Defendant BHA Group, Inc., the successor to Baghouse Associates, was acquired by GE in 2004. (Doc. 33, pp. 42 (First Amend. Compl. ¶ 16) & 57-58 (Answer ¶ 16)). GE operates BHA as a separate entity within its GE Energy division. (Id.). GE/BHA[3] contracts with industrial producers of effluent to change bags that collect effluent in baghouses, and performs related services.

In or around 1992, Ray Lacy worked as a consultant and later a Technical Advisor ("TA") to BHA. In his capacity as TA, Lacy was in charge of crews of men working in baghouses to replace full bags with new ones and to perform maintenance.

In or around 1996, Ray Lacy ceased working for BHA and started a business called Lacy Enterprises. From 1996 through 2004, Lacy Enterprises leased laborers to BHA to perform the same type of baghouse work that Lacy had previously supervised as a GE/BHA TA. After GE acquired BHA, Lacy Enterprises began contracting to lease workers directly to GE.

The plaintiffs, all of them black[4] men, were workers Lacy Enterprises leased to GE/BHA.[5] Plaintiffs allege that GE/BHA engaged in illegal, intentional discrimination on the

---

[2]   In resolving this motion for summary judgment, the Court construes the evidence and the factual allegations in a light most favorable to the plaintiffs. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999) (When ruling on a motion for summary judgment, the court "should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion.").

[3]   The defendants' arguments focus solely on BHA, as Defendants reason that GE "could be liable to Plaintiffs if, and only if, BHA is liable." (Doc. 73-1, n. 3). Without accepting or rejecting that conclusion, this analysis refers to BHA and GE interchangeably and as a single defendant.

[4]   GE/BHA states in its brief that one of the plaintiffs is "Caucasian," but presents no evidence to support that claim. (See id.).

basis of race in violation of both Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and Section 1981 of Title 42 of the United States Code, by creating a racially hostile work environment and allowing it to persist on jobs to which the plaintiffs were assigned and by discharging the plaintiffs on the basis of race.   (Id., pp. 40 ¶ 1; 48-50 ¶¶ 62, 65-68, 73-81)).   Plaintiffs also allege that GE/BHA violated Section 1981 by terminating their employment in partial retaliation for the plaintiffs' and Ray Lacy's opposition to racial abuse allegedly perpetrated by GE/BHA employee Lynn Dyer ("Dyer").  (Id., p. 49 ¶¶ 69-72).

Plaintiffs filed their complaint on August 19, 2008.  (Doc. 33, pp. 16 & 23).  An amended complaint was filed on December 12, 2008.  (Id., pp. 17 & 40).  Jurisdiction is alleged pursuant to Title 28 United States Code, Section 1343.  (Id. (First Amend. Compl. ¶ 2)).

**B.  History of Complaints Regarding Racism**

Lacy Enterprises worked on a job for GE/BHA with Dyer that Ray Lacy refers to as "Alcoa."  (Doc. 84-6, p. 3 (Ray Lacy Dep. 14:18-20)).   On the Alcoa job Dyer complained to GE/BHA's Director of Project Management and Services Tommie Lampe ("Lampe")[6] that Lacy Enterprises' black crew members were not working.  (Id. (Ray Lacy Dep. 14:21-15:18)).  Lampe then called Ray Lacy and said she wanted two or three of the Lacy Enterprises crew members

_____

[5] GE/BHA characterizes the plaintiffs as "seasonal subcontractors" rather than "leased workers." (See Doc. 73-1, p. 8).

[6] In her capacity as Director of Project Management and Services, Lampe was responsible for services for some of the product lines, which "included technical advisors." (See Doc. 84-8, pp. 7-8 (Lampe Dep. 13:8-14:15).  She also supervised project managers in the execution of baghouse system projects.  (Id.).

Beginning in June of 2007, Lampe's title changed to Project Management Program Leader, and Keith Gooch assumed her old duties.  (Id., pp. 9-10 (Lampe Dep. 15:6-16:13)).  After he assumed the role of Director of Project Management and Services, Gooch was initially supervised by Mark Hachenski. (Id.).

sent home.  (Id.)  When Ray Lacy asked why sending the workers home was necessary, Lampe replied that Dyer had reported that the crew members would not work or were lazy.  (Id.)  Ray Lacy responded by arranging a conference call with Lampe, Ed Shupert ("Shupert"), who reported to Lampe, and Project Managers Cale Collier ("Collier") and Keith Gooch ("Gooch").  (Id.).  During the call, he explained that the Lacy Enterprises crew working on the Alcoa job was "the best crew [Lacy Enterprises] had and that they were, in [Ray Lacy's] opinion, doing what they were supposed to do."  (Id.).  The subject of Dyer's allegedly racist comments arose during the conference call, and Shupert responded by asking, "[A]re you saying that Lynn Dyer is a racist?  If it's true, then . . . we have problems."  (Id.).  Ray Lacy replied, "Mr. Dyer is harassing my men, and it must stop."  (Id.).

On or about August 29, 2006, Ray Lacy emailed Collier regarding what happened at Alcoa and informed Collier that "Lynn [Dyer] has had his racist comments and attitude from day one . . . [and] of course, the men resent it very much since he doesn't hide his views on working blacks."  (Id., pp. 3-4 (Ray Lacy Dep. 16:2-18:7); Doc. 89-24).   In the August 29 email, Ray Lacy also told Collier:  "you have been defending Lynn from the start, but now is the time to open your eyes."  (Id.).  Ray Lacy had previously "been telling GE, Cale Collier, anybody who would listen, [that Dyer's] attitude towards blacks was not acceptable . . . ."  (Id.).  Before sending the email on August 29, 2006, Ray Lacy had both spoken with Collier and sent Collier emails regarding the issue.  (Id.).  Ray Lacy observed that Dyer resented having an all black crew working for him "[b]ecause of his attitude toward them on every job they went on.  He considered them lazy, told them so."  (Id.).

In February of 2007 during a job for a client named Buzzi, Ray Lacy told Gooch over the phone "[t]hat Lynn Dyer was acting in a racist and harassing manner towards African-Americans

on these crews." (Id., p. 18 (Ray Lacy Dep. 129:4-130:5)); (Doc. 89-20, p. 1). Gooch repeatedly responded by saying "I don't want to hear it." (Doc. 84-6, p. 18 (Ray Lacy Dep. 129:4-130:5)).

Ray Lacy also told Collier during the Buzzi job that he thought Dyer was working the Lacy Enterprises crews hard because of Dyer's attitude towards blacks. (Doc. 84-3, p. 17 (Collier Dep. 36:5-10)). Ray Lacy also communicated to Collier after the job that Dyer was "a racist," that Dyer "hate[d] blacks and won't work with them." (Id., p. 18 (Collier Dep. 37:10-24)). At that point, Collier passed along all of this information to Lampe (id.), and Ray Lacy and Collier both also informed Shupert that Ray Lacy was accusing Dyer of racism. (Id., pp. 21-22 (Collier Dep 40:12-41:2)).

Plaintiffs allege that throughout his working relationship with Lacy Enterprises' crews, Dyer harassed the plaintiffs on account of their race. For example, Plaintiff Jonas Murphy ("Murphy") stated that "Dyer cursed at us if he found a problem . . . [and] would call us things like 'sorry ass niggers' . . . ." (Doc. 87-8, p. 1 (Murphy Decl. ¶ 4)). Murphy further stated that "[d]uring a job in Tacoma, Washington, Dyer called our crew 'sorry ass niggers' and told us 'you don't work for us no more' because the bags that he gave us to install were too short. Dyer told the crew: 'You need to make the bags fit.'" (Id. ¶ 5). Plaintiff Carl Green ("Green") stated that on a job in St. Louis, when his hands were hurting from exposure to the cold and his co-worker Antonio Denson ("Denson")'s hands were "dr[y] and blistered because he had been working too long out in the cold," Green, Denson, and a couple of other men went down to Dyer's trailer where they sat in front of a heater for ten minutes until Dyer walked in and inquired, "What the [expletive] are you all doin' in my office?". (Doc. 86-13, p. 3 (Green Decl. ¶¶ 13-14)). When Green and the others "tried to explain to Dyer that we needed to warm up . . . and that Denson needed to go to a doctor because his skin was so bad, Dyer called us 'chicken

shit mother [expletive]' and told us we are getting paid to work. He said, 'get your black asses the [expletive] out of my office.'" (Id., ¶ 15). As the group was leaving the trailer, Dyer told them they were all fired. (Id.).

Finally, Plaintiff Robert Walker ("Walker") stated in his deposition that Dyer called him a "nigger" during a St. Louis job. (Doc. 84-12, pp. 21-23 (Walker Dep. 45:7-47:14)).[7] Dyer said to three Lacy Enterprises employees, including Walker: "y'all sorry niggers need to get back to work." (Doc. 84-12, p. 23 (Walker Dep. 47:2-5)). Walker responded by

> jump[ing] up out [of his] seat . . . and t[elling Dyer] I don't want him to use that kind of words towards me no more. I don't care what he say to me, but don't call me nigger because I wasn't [using . . . ] racial slurs like that, so I know he shouldn't do it to me. . . . Don't do it. I told him.
>
> And when I told him that, I don't know if he felt threatened by it or whatever, but I didn't threaten, put my hands on him or nothing. I told him don't do it no more . . . and he told me to get off the premises, me and the other guys. . . . [b]y them being there with me, he told all three of us to get off the premises.
>
> [Dyer told me to] get off the job. He didn't want to work with me no more. That was the last job I worked for Lacy.

(Id., pp. 21-22 (Walker Dep. 45:13-46:22)).

### C. "The Demise of Lacy"

Following the Buzzi job, Lampe and/or Shupert instructed Collier not to use Lacy Enterprises crews anymore and told Collier that they would be notifying Ray Lacy that the relationship between the companies had ended. (Id., p. 21 (Collier Dep. 2-6)). However, GE/BHA continued to use Plaintiffs on five jobs following Buzzi. (See Doc. 87-1, pp. 1-2

---

[7] Plaintiffs maintain, and GE/BHA does not appear to dispute, that this incident occurred on the Buzzi job. (Doc. 83, p. 19).

(Lacy Decl. ¶¶ 405)).  The last of those jobs, the so-called "Cargill" job, ended on April 17, 2007.  (Id.).

On Monday, April 23, 2007, Ray Lacy sent an email to GE/BHA employees Kenneth McDonald, Gooch, and Lampe.  The email stated:  "This game is about over with the libelous remarks made about me and m[y] all black crew.  They are livid about your and GE's attitude." (Doc. 89-3, p. 1).

The next day, Lampe forwarded Ray Lacy's April 23 email to Sourcing Leader Sam Chen ("Chen")[8] and to Gooch.  (Id.).  She prefaced the forwarded email with a message that states:  "there have never been any racial comments from our people.  Keith [(Gooch)], I have had it with Lacy and their lack of professionalism.  It's time to part company."  (Id.).  Lampe explained in her deposition that she meant in her email "that in mind of . . . [GE/BHA's] past history with Lacy . . .[,] maybe we shouldn't do business with them any longer."  (Doc. 84-8, pp. 62-63 (Lampe Dep. 62:21-63:2)).

In response to being asked how she "kn[e]w" that "Mr. Lacy was alleging that someone at GE had made racial comments," Lampe stated in her deposition:  "[f]rom his comment about libelous remarks about me and the all black crew."  (Doc. 84-8, p. 28 (Lampe Dep. 47:1-5)).

On Thursday, April 26, 2007, Ray Lacy emailed Lampe and wrote:

> It is the opinion of my black crew members that you, . . ., and Lynn, by refusing to work with Lacy Enterprises, by your own documented statements have, and are, causing great hardship on them and their families. . .

****

---

[8]  In his capacity as Sourcing Leader, Chen "make[s] sure that [GE/BHA] has adequate resources to support . . . the environmental services operation and make[s] sure [GE/BHA has] got the right suppliers, make sure they meet our GE supplier standards," which "covers the baghouse operations." (See Doc. 84-2, pp. 3-4 (Chen Dep. 8:6-16; 21:6-17)).

> These men know the feelings Lynn Dyer has about working blacks. Very strong feelings conveyed to them over the years and again documented on the Buzzi job. Yet, they TOOK his abuse to keep their livelihoods. . . .
>
> Lacy Enterprises cannot continue to see them discriminated against.
>
> ALL WE WANT TO DO IS WORK! START GIVING US JOBS.

(Doc. 89-4, p. 1).

The next day, Lampe forwarded the Ray Lacy's April 26 email to GE/BHA employees including Pam Kile ("Kile") and stated "I am working with [(BHA general counsel)] Scott Blair on response and potential investigation. Will keep you updated." (Id.; Doc. 73-1, p. 42 (identifying Scott Blair as BHA general counsel)). Kile replied, copying Scott Blair: "Tommie, have you had complaints about Lynn in the past regarding any type of racial discrimination. What was documented on the Buzzi job?". (Doc. 89-4, p. 1). Lampe replied: "I have not had any complaints about Lynn in the past and I have reason to doubt that the indication is accurate. At this point, we are getting a response together for Norm Lacy and asking for specifics so we can investigate. It is innuendo at this juncture and may not develop further." (Id.).

Kile alerted Chen to the situation in an effort to "understand [Lacy Enterprises'] ability to do the work relative to other suppliers." (Doc. 89-6, p. 1). Chen replied to Kile: "We have other suppliers to work with for labor." (Id.). However, he also noted that "In general, we would like to have more labor supplier capacity." (Id.).

On May 3, 2007, Lampe emailed Ray Lacy. (Doc. 89-20). She stated:

> I received your email on April 26, 2007, and wanted to get back to you on the concerns you raised and to request additional information on specifics on some of the issues.
>
> We continue to search for fabric filter bag installation work that would include Lacy Enterprises as a potential subcontractor. The Sales and Product Management group for this product . . . had a . .

. session recently to try to help drum up some additional business. The business has been a bit slow right now and we hope that this trend will turn soon.

There have been numerous projects through the year that have been manned by Lacy Enterprises satisfactorily. However, after a tough project at Buzzi in February 2007, and discussions with you and Tony and Keith and myself, we agreed that we need to focus on work for a 6-9 crew size plus supervision. This is the size of project that best suits Lacy's capabilities.

In your email, you stated Lynn Dyer has conveyed very strong negative feelings towards your men. You also noted that such feelings were documented on the Buzzi job. You also concluded that Lacy Enterprises cannot continue to see them discriminated against. We are not aware of any discriminatory comments, feelings, or behavior towards your work crews, and we have received no previous complaints or concerns. Your letter raises significant questions and concerns that we need to investigate. Norm [(a.k.a. Ray)], I would really appreciate if you would provide details about what was said, when, and who was involved from our representatives, including any documentation from the Buzzi project. We would involve our GE team to conduct an investigation and identify any corrective actions.

I would appreciate your responses regarding the specifics as soon as possible. We will continue to keep you appr[]ised of business we obtain where we can request Lacy Enterprise to help provide the service.

(Id.).

On May 9, 2007, GE/BHA employee Grant Duffey ("Duffey") emailed fellow employee Sarah Marshall ("Marshall"), and copied Chen. (Doc. 89-7, p. 2). Duffey wrote: "I need to have Lacy Enterprises . . . put on suspension until further notice." (Id.). Marshall replied and asked Duffey, "Is the[re] something I can put on the account why we are suspending them?". (Id., p. 1). Duffey replied a moment later: "Not at this time. Touchy matter." (Id. (Email from Duffey to Marshall)). Marshall wrote back: "Okay have Tom or Sam say it's okay and I'll get him suspended." (Id.). Duffey forwarded the entire email train to Chen, who replied: "Yes,

please suspend this vendor so that no one can please new PO to them until further notice." (Id. (Email from Chen to Duffey and others)).

On May 21, 2007, Grant Winter, who Plaintiffs identify as a GE/BHA estimator, sent an email entitled "The Demise of Lacy" to a number of other GE/BHA employees, including Lampe, Gooch, Chen, and Robert O'Conor ("O'Conor"). (Doc. 89-8, pp. 2-3)). The email stated:

> Project Management has informed Joe and I that we will no longer be able to use Lacy.
>
> We understand this was most likely for quality reasons, however, we want to be sure that the ramifications are understood prior to making this decision:
>
> - No replacement contractor was secured prior to this decision essentially eliminating us from the Southern and Mid-Atlantic regions. The closest contractors now are located in Illinois and Oklahoma.
>
> - Per the analysis conducted last year, Lacy represents approximately $800,000 in top-line sales per year. This does not take into account Lacy's involvement outside of their region easily putting this number over $1,000,000. To meet goal, we needed $1.2M out of them this year.
>
> - We currently have a $225,000 backlog of which jobs were bid for Lacy. These will need to be rebid using other contractor, however, will likely be lost due to bullet one. In addition, we will be bidding Chicago rates for South Carolina work.
>
> ****
>
> In this time we are looking to grow this business by 53%, we have lost 2 prime contractors representing 45,000 of our required 90,000 labor hours . . . .
>
> ****
>
> Prior to [ ] informing . . . sales of this recent decision, I'd like buy-in from the remainder of management that this is how we wish to proceed.

> In addition, it would be beneficial if sourcing could provide a timeline and plan on when we can expect to have coverage in these areas, and any ideas Project Management in regards to how we can provide coverage in the meantime.
>
> Joe and I will do what we can in the meantime to aid sales in continuing to focus on selling quality, and help manage rebids that could double the original price presented to valued customers.

(Id.)

O'Conor replied to the group asking, "Is there a plan to replace[?] Don't want to state the obvious, but if there isn't, then do we adjust goal since we'll be unable to meet consumer demand?". (Doc. 89-9, p. 1)). Chen then replied to the group and explained that "[t]he reason for the temporary suspension is sensitive. [General Counsel] Scott Blair is working to resolve the situation right now. Should the situation be resolved successfully, we can work with them again. . . . In the mean time, there is another supplier in the region we can use." (Doc. 89-10, p. 1). Chen explained in his deposition that the sensitive reason he was referring to was "the threat of litigation." (Doc. 73-20, p. 7).

On June 4, 2007, Chen wrote a group of GE/BHA employees, including Lampe, and related advice he had received from general counsel Scott Blair that "the current case . . . should not stop us from working with Lacy." (Doc. 73-20, p. 25). Chen cautioned though that before the temporary suspension could be lifted, "we need all people to understand the sensitive situation and assign appropriate personnel to work with [Lacy Enterprises]." (Id.). He asked Lampe, "Could you set up a meeting with your PMs [(presumably, Project Managers)] to brief the situation and the condition that we need to be sensitive to in working with Lacy?" and advised her, "I will wait for your signal to un-suspend Lacy in the system." (Id.). On June 6, 2007, Lampe replied to Chen and the group he had emailed:

> The direction Project Management has is as follows regarding Lacy potential subcontracted labor.

> If a job has the labor requirement that fit potential availability of
> supervision and a small crew from Lacy to do the work without
> Technical Advisor at the site, Keith will discuss the possibility
> with me. If Keith and I decide to move forward, we will request
> Procurement contact Lacy to see if they have the availability to
> properly represent us at site . . . .
>
> Please advise if you have any questions.

(Id.). Lampe affirmed in her deposition that by "if Keith and I move forward," she meant "if [we] decide to give Lacy additional work." (Doc. 73-19, pp. 13-14 (Lampe Dep. 83:8-84:24)).

In 2006, GE/BHA's baghouse revenue was approximately $3.6-3.7 million. (Doc. 73-13 (Gooch Dep. 49:11-50:10)). In 2007, it was approximately $3.5 million. (Id.).

Since June 2007, GE has completed many 6- to 9-person jobs of the sort Lacy Enterprises could have performed. (Doc. 84-8, p. 35 (Lampe Dep. 95:6-15)).

## III. Analysis

### A. Title VII Standing

Title VII defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person . . . ." 42 U.S.C. § 2000e(b). The same statute defines "employee" as "an individual employed by an employer . . . ." Id. at (f).

In their summary judgment briefing, GE/BHA argues that Plaintiffs lack standing to sue under Title VII because Plaintiffs were not the employees of GE/BHA: "Title VII applies to employees but not contractors. . . . Plaintiffs were not BHA employees. Whether Plaintiffs are [Lacy] Enterprises' employees, or contractors—Enterprises pays and treats the Plaintiffs as independent contractors—is Enterprises' issue, but Plaintiffs are without doubt *not* BHA employees" (Doc. 73-1, p. 9); "only 'employees' may sue 'employers' under Title VII. []

Because Plaintiffs were by no stretch of the imagination employees of BHA, they have no Title VII claim." (id., p. 13).  In support of the conclusion that the plaintiffs were not employees of GE/BHA, GE/BHA cites precedent applying a "hybrid economic realities" test that the Eleventh Circuit has employed when determining whether plaintiffs are the employees (or independent contractors) of Title VII defendants.  (See Doc. 73-1, p. 14 (citing Cobb v. Sun Papers, Inc., 673 F.2d 337, 340-41 (11th Cir. 1982) (affirming district court's conclusion that former janitor/custodian was independent contractor and therefore not subject to Title VII's protections) and Cuddeback v. Fla. Bd. of Educ., 381 F.3d 1230, 1234 (11th Cir. 2004) (affirming district court's finding that graduate student was an "employee" of the university for purposes of Title VII))).

By contrast, the plaintiffs contend that "[t]he [Title VII] issue for summary judgment is not whether Plaintiffs were *either* employees of G.E. or alternately, independent contractors of Lacy Enterprises.  It is whether Defendants were joint employers of plaintiffs with Lacy . . . ." (Doc. 83, p. 32) (emphasis in original).  The Court agrees with Plaintiffs.

Courts applying Title VII have employed the "joint employer" analysis in two different contexts.  First, the analysis has been used to determine whether the employee-numerosity requirement found in Title VII's definition of "employer" may be satisfied by aggregating the employees of two otherwise distinct entities.  However, this application is irrelevant in this case as the parties do not appear to dispute that during all times relevant to this litigation GE/BHA employed more than fifteen employees under the circumstances enumerated in Title VII's definition of "employer."  Second, courts have applied the joint employer analysis to determine whether a defendant may be held liable to a Title VII plaintiff who is employed by another entity.  See  Llampallas v. Mini-Circuits Lab, Inc., 163 F.3d 1244 (11th Cir. 1998)

(characterizing the joint employer doctrine as a "theory of liability"); Walden v. Verizon Bus. Network Servs., et al., No. 1:06-cv-2394-WSD-WEJ, 2008 WL 269619, at *13-14 (N.D. Ga. Jan. 29, 2008) (adopting report and recommendation that concluded joint employer inquiry was appropriate for determining whether a defendant that had procured the plaintiff's services through a recruiting/staffing agency could be considered the plaintiff's "employer, and thus potentially liable under Title VII"); Watson v. ADECCO Emp't Servs., Inc., et al., 252 F. Supp. 2d 1347, 1354-56 (M.D. Fla. 2003) (applying the "joint employer theory of liability" to conclude that a temporary employment agency did not meet Title VII's "employer" definition); see also Zillyette v. Capital One Fin. Corp., 1 F. Supp. 2d 1435, 1444 (M.D. Fla. 1998) (suggesting in dicta that a "joint employer" test would apply to the question of whether a parent corporation could be considered an "employer" when its subsidiary directly employed the defendant). It is this application of the joint employer analysis that the plaintiffs argue renders GE/BHA liable for the claims alleged under Title VII.

There is no material dispute, and the Court finds as a matter of law, that the plaintiffs are "employees" (as opposed to independent contractors) "employed by" Lacy Enterprises within the meaning of Title VII.[9]  The hybrid economic realities test adopted by the Eleventh Circuit provides that "the economic realities of the relationship viewed in light of the common law principles of agency and the right of the employer to control the employee . . . are determinative" of employee status.  Cobb, 673 F.2d at 341.  The Cobb court suggested that the following common law agency factors are "relevant to the consideration of this issue":

---

[9]     GE/BHA presents no evidence or argument on summary judgment that prevents this conclusion, preferring to treat the issue as if it were irrelevant.  (See Doc. 73-1, n. 7 ("[T]he issue of whether Plaintiffs were employees or independent contractors of Enterprises is beyond the scope of this case."); Doc. 93, p. 25 ("Plaintiffs were independent contractors (or employees) of Enterprises")).

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

Id. at 340 (quoting Spirides v. Reinhardt, 613 F.2d 826 (D.C. Cir. 1979) and citing Lutcher v. Musicians Union Local 47, 633 F.2d 880, 883 n. 5 (9th Cir. 1980)). However the Cobb court emphasized that while

> [c]onsideration of all of the circumstances surrounding the work relationship is essential, and no one factor is determinative . . . , the extent of the employer's right to control the means and manner of the worker's performance is the most important factor to review here, as it is at common law . . . If an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist.

Cobb, 673 F.2d at 340 (internal quotation marks omitted).

The Eleventh Circuit clarified in Cuddeback that when evaluating the common law principles of agency, "[s]pecifically the court should consider factors such as whether the defendant directed the plaintiff's work and provided or paid for the materials used in the plaintiff's work."  GE/BHA presents evidence that Lacy Enterprises "hired Plaintiffs . . .; paid Plaintiffs for their services . . .; decided each person's hourly rate . . . ; supplied their tools . . .; provided their transportation . . . ; paid for their food and lodging . . . ; supplied their hard hats, safety glasses, respirators, gloves and protective clothing . . . ; gave them annual safety training required by federal law . . . ; paid for their workers' compensation insurance . . . ; drug-tested

them annually . . . ; employed a crew supervisor and a crew foreman to supervise and direct Plaintiffs' work . . . ; fired them . . . ; [and] issued them warnings." (<u>See</u> Doc. 73-1, pp. 9-10 and record evidence cited therein). The plaintiffs present evidence that baghouse work is unskilled labor. (<u>See</u> Doc. 84-10, p. 4 (Leslie Packer Dep. 13:2-8 (Packer had "never in [his] life" performed baghouse services before arriving on the job with Lacy Enterprises, but "when [he] got there [he] just watched them, s[aw] what they were doing, [and] then [ ] start[ed] filling in what they were doing and it just went from there")); Doc. 84-11, pp. 4-5 (Kelvin Riley Dep. 15:3-16:2 (Riley first came to work for Lacy Enterprises after he was "walking through the projects one day, and they w[ere] hollering about they know a man who . . . needed some men. Me, I ain't got nothing to do . . . so I just got in the truck with them . . . then I got . . . on-the-job-training, then I . . . became part of Mr. Lacy's crew"))). There is no doubt, in light of this evidence, that Lacy Enterprises had the "right to control the means and manner of the worker[]s['] performance," and that it "provided or paid for the materials used in the plaintiff[]s['] work." Moreover, there is no dispute that the work performed by the plaintiffs was not only an integral part of the business of the employer; it appears to be the only business of the employer.[10]

---

[10] GE/BHA describes Plaintiffs as "[s]easonal, [F]orm-1099 subcontractors" (Doc. 73-1, p. 8), and submit sample copies of certain plaintiffs' 1099 tax forms, which reflect that Lacy Enterprises withheld no income taxes from the plaintiffs' pay and identify the compensation Lacy Enterprises paid the plaintiffs as "Nonemployee compensation." (<u>See</u>, <u>e.g.</u>, Doc. 73-11, p. 32 (Robert Walker Dep. Exh. 2); Doc. 73-12, p. 23 (Kelvin Riley Dep. Exh. 6)). In light of the evidence suggesting that the plaintiffs were Lacy Enterprises' employees, the fact that Lacy Enterprises did not withhold taxes from Plaintiffs' checks is insufficient to deem them independent contractors. <u>See</u> <u>Cobb v. Sun Papers, Inc.</u>, 673 F.3d 337, 341-42 (11th Cir. 1982) ("This Court has held that employee status under Title VII is a question of federal law") (citing <u>Calderon v. Martin Cnty.</u>, 639 F.2d 271 (5th Cir. 1981) and affirming lower court's finding that "the evidence on the question was mixed" and "weigh[ing of] all the factors involved in the situation in making its determination" that the plaintiffs were independent contractors).

In an effort to support the notion that the plaintiffs are merely seasonal workers who were not economically dependent on baghouse work, GE/BHA submits evidence that approximately one-third of
(Continued)

The threshold Title VII inquiry, then, is whether GE/BHA can be considered the plaintiffs' joint employer with Lacy Enterprises.

GE/BHA is a joint employer with Lacy if it is determined that

> [GE/BHA] while contracting in good faith with an otherwise independent company [(Lacy Enterprises)], has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer [(Lacy Enterprises]. Thus the joint employer concept recognizes that the business entities involved are in fact separate but that they *share* or co-determine those matters governing the essential terms and conditions or employment.

Virgo v. Riviera Beach Assoc., 30 F.3d 1350, 1360 (11th Cir. 1994); Swallows v. Barnes & Noble Bookstores, Inc., 128 F.3d 990, n. 4 (6th Cir. 1997) (internal quotation marks omitted) (ADA/ADEA case cited by the Eleventh Circuit in Llampallas, 163 F.3d at 1245 for its

---

Lacy Enterprises' workers also work as fishermen, and that these individuals worked for Lacy Enterprises approximately one-half of the year, during the fishing off-season. (Doc. 73-5, p. 60 (Ray Lacy Dep. 146:3-21). However, there is no evidence to suggest that these fishermen also comprise a significant number of the plaintiffs in this lawsuit. On the contrary, GE/BHA points specifically only to the deposition of Robert Walker, which tends to establish that five of the plaintiffs—Carlos Hicks, Wilbert Richardson, Timothy Sigler, Jasper Smith, and Robert Walker—work as fishermen half of the year. (See Doc. 73-1, pp. 22-23 & Doc. 73-11, pp. 3 & 5 (Robert Walker Dep. 7:6-25; 11:10-16)). In addition, GE/BHA presents evidence that during the relevant time period, another plaintiff, Kelvin Riley, cut trees, did cabinet work, and mowed lawns when he was not working for Lacy Enterprises. (See Doc. 73-12, p. 5 (Kelvin Riley Dep. 9:10-25)). This evidence that a handful—no more than approximately ten percent—of the plaintiffs found ways to make money in addition to working for Lacy Enterprises is insufficient to support a finding that the plaintiffs were independent contractors, particularly in light of the evidence suggesting that the plaintiffs were Lacy Enterprises' employees.

GE/BHA also submits an unsigned agreement, labeled an "Independent Subcontractors Agreement" that it claims is typical of the contracts that the individual plaintiffs executed with Lacy Enterprises. (See Doc. 73-6, p. 98 (Ray Lacy Dep. Exh. 19). GE/BHA does not point to any evidence tending to establish that each individual plaintiff executed such an agreement with Lacy Enterprises. (See Doc. 73-1, p. 19; Doc. 73-8, p. 27 (Anthony Ray Lacy Dep. 75:13-16)). Even if GE/BHA had submitted evidence tending to establish that each individual plaintiff signed such agreements, the mere title of the agreements would not be dispositive. In addition, several terms of the Independent Subcontractors Agreement support the conclusion that Plaintiffs were Lacy Enterprises employees, such as the provision for a daily wage to be prorated on an hourly basis. (See Doc. 73-6, p. 98 (Ray Lacy Dep. Exh. 19 ¶ 2).

explanation of "the differences between the joint employer theory and the single employer theory").

The determination of whether two entities may be considered a joint employer under Title VII is a question of fact for the jury. See Virgo v. Rivera Beach Assocs., Ltd., 30 F.3d 1350, 1359-60 (11th Cir. 1994) ("[w]hether the [defendant] retained sufficient control [to support a finding that it was a joint employer] is essentially a factual question"); accord Lyes v. City of Riviera Beach, Fla., 166 F.3d 1332 (11th Cir. 1999) (en banc) (treating the similar question of whether two entities, one of them a municipality, could be treated as a single employer as "a question of fact") (citing McKenzie, 834 F.2d at 933)); Clark v. St. Joseph/Candler Health Sys., et al., No. 06-14903, 225 Fed. Appx. 799, at **1 (11th Cir. Apr. 4, 2007) (per curiam); U.S. E.E.O.C. v. Rooms to Go, Inc., No. 8:04CV2155T24TBM, 2006 WL 580990, at *9 (M.D. Fl. Mar. 8, 2006); Walden v. Verizon Bus. Network Servs., et al., No. 1:06-cv-2394-WSD-WEJ, 2008 WL 269619, at *13-14 (N.D. Ga. Jan. 29, 2008).

The plaintiffs present sufficient evidence that GE/BHA retained sufficient control of the terms and conditions of employment of the plaintiffs to avoid summary judgment on the grounds that GE/BHA was not a joint employer. For example, the Master Agreement, which established and governed the terms of the services that Ray Lacy/Lacy Enterprises provided to BHA, states that Lacy shall "supervise and direct the [w]ork, using his best skill and attention[,] . . . shall be solely responsible for all construction means, methods, techniques, sequences, and procedures and for coordinating all portions of the work . . . *unless otherwise directed by BHA*." (Doc. 93-1, p. 16 (Master Agreement ¶ 8.0) (emphasis added). The Master Agreement also provides that Lacy's work "shall be performed under the direction of BHA[ ] and to the satisfaction of BHA." Id., p. 15 ¶ 3.0. It further states that "BHA shall provide general supervision of" Lacy and "may

make alternate arrangements for portions of the work . . . , equipment[,] or supplies;" that "[a]ll [w]ork shall be satisfactory to BHA . . ."; and that "BHA shall at all times have access to the work." Id., p. 16 ¶¶ 7.0, 7.1. The Master Agreement thus arguably reserves for GE/BHA the authority to direct and supervise Lacy Enterprises' work.

There is also evidence that GE/BHA exercised this contractual authority to control the terms and conditions of the plaintiffs' employment. Plaintiffs submit evidence that GE/BHA employee Lynn Dyer[11] ("Dyer") frequently interacted with/instructed and disciplined Lacy crew members directly. (Doc. 73-8, p. 12 (Anthony Ray Lacy Dep. 31:19-33:3); Doc. 84-9, p. 9 (Mark Lewis Dep. 43:1-8 (Dyer gave instructions directly to the crew approximately "25 percent of the time"))). The record also includes evidence that Dyer set the hours and break times for the crews when he was acting as TA on projects with Lacy Enterprises. (See, e.g., Doc. 87-15, p. 1 (Reginald Richardson Decl. ¶ 4 ("Dyer told us how much to work. If he wanted the crew to finish a unit, he would make us work longer than the regular 12-hour day")); Doc. 87-20, p. 1 (Quincy Scott Decl. ¶ 8 ("Dyer told us at the beginning of the job how long our workshift would be . . . If Dyer wanted to get the job done, he made the crew work 16 hours a day")); Doc. 88-4, p. 3 (Willie Sigler Decl. ¶ 19); Doc. 86-3, p. 2 (Karlos Beasley ¶ 10); Doc. 84-6, p. 12 (Ray Lacy Dep. 77:5-79:18)). On summary judgment, the Court must give credence to the plaintiffs' evidence to the extent it contradicts evidence submitted by GE/BHA. See Tipton, 965 F.2d at 998-99. Accordingly, summary judgment cannot be granted on the grounds that GE/BHA was

---

[11] There is evidence that although a TA was not present on the majority of joint GE/BHA/Lacy Enterprises jobs, Dyer was the TA on a significant number of Lacy Enterprise jobs, approximately 25-30 per year during the time period Lacy Enterprises was providing baghouse services to GE/BHA. (See Doc. 84-4, p. 6 (Lynn Dyer Dep. 36:9-12)).

not the plaintiffs' joint employer with Lacy Enterprises.  As a consequence, nor can summary judgment be granted on the basis that the plaintiffs were not GE/BHA's employees.

### B.  Section 1981 Standing

GE/BHA moves for summary judgment on the plaintiffs' Section 1981 claims on the ground that "[i]ndividual plaintiffs who are not parties to a contract that is terminated or under which they sustained harm[] lack standing to bring a § 1981 claim."  (Doc. 73-1, p. 27).  They reason that "[b]ecause Plaintiffs do not allege—and cannot show—that they were parties to a contract with BHA, there is no claim under § 1981."  (Id., p. 28).

Plaintiffs counter that a contractual relationship giving rise to Section 1981 standing exists and "is based on the agreement that plaintiffs provide a benefit/service to defendants, for which they were to be compensated, even if indirectly.  No written contract is needed."  (Doc. 83, p. 50).

If the plaintiffs can prove at trial that GE/BHA was their joint employer within the meaning of Title VII, then they will be able to pursue their Section 1981 claims on the grounds that they are constructive, at-will employees of GE/BHA.  As the court explained in Barbosa v. Continuum Health Partners, Inc., No. 09 Civ. 6572, 2010 WL 768888 (S.D.N.Y. Mar. 8, 2010):

> Several doctrines have been developed to allow a plaintiff to assert employer liability in the employment discrimination context against entities that are not her formal, direct employer. These doctrines apply under . . . Section 1981 . . . .  Under one such doctrine—the "joint employer" doctrine—an employee formally employed by one entity can be found to be constructively employed by another entity and may therefore state an employment discrimination claim against her constructive employer as well as her direct employer.

Id. (citing Snyder v. Advest, Inc., No. 06 Civ 1426, 2008 WL 4571502, at *6 (S.D.N.Y. Jun. 8, 2008)); see also Perrymond v. Lockheed Martin Corp., No. 1:09-CV-1936-TWT, 2009 WL 2474226 (N.D. Ga. Aug. 12, 2009) (report and recommendation adopted by district court)

(concluding that in light of Title VII's joint employer doctrine "and Plaintiffs' allegations that Lockheed and Global [Contract Professionals] exercised joint control over Plaintiff's employment conditions, . . . Plaintiff's Title VII and § 1981 claims against Global and Lockheed as joint employers are not frivolous." Id. at *3); Robinson v. Int'l Paper Co., No. 07-610-KD-C, 2008 WL 4080208, n. 8 (S.D. Ala. Aug. 29, 2008) (at-will employment contracts deserve protection under Section 1981 (collecting cases)); Lane v. Ogden Entm't, Inc., 13 F. Supp. 2d 1261, 1272 (M.D. Ala. 1998) (same).

However, if Plaintiffs are unable to establish that GE/BHA is their joint employer, then the plaintiffs will be unable to proceed under Section 1981 because plaintiffs have never directly contracted with GE/BHA and would therefore lack standing. See Danco v. Wal-Mart Stores, Inc., 178 F.3d 8, 14 (1st Cir. 1999) ("[n]othing in Section 1981 provides a personal claim, so far as its language is concerned, to one who is merely *affiliated*—as an . . . employee—with a contracting party that is discriminated against by the company that made the contract").

As noted above, Plaintiffs have presented sufficient evidence to survive summary judgment on the grounds that GE/BHA was not the plaintiffs' joint employer with Lacy Enterprises. As a result, summary judgment based on an absence of standing is likewise denied as to the Section 1981 claims.

## C.  Hostile Work Environment Claims

To establish a hostile work environment claim pursuant to Title VII, a plaintiff has the burden of proving "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002). To meet this burden, a plaintiff must show: (1) he belongs to a

protected group; (2) he has been subject to unwelcome harassment; (3) the harassment was based on a protected characteristic, such as race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for such environment under a theory of vicarious or direct liability.  Id.

GE/BHA does not challenge the plaintiffs' ability to present sufficient evidence as to the first four elements of a hostile work environment claim.  Instead, GE/BHA argues that Plaintiffs cannot establish the final element—that BHA is responsible for Dyer's alleged conduct.  To establish a hostile work environment claim, Plaintiffs must show that GE/BHA "is responsible for such environment under a theory of either vicarious or direct liability."  Lewis v. U.S. Dept. of Labor Admin. Review Bd., 368 Fed. Appx. 20, 30-31 (11th Cir. 2010) (per curiam) (citing Miller, 277 F.3d at 1275).  In this case, the appropriate theory of hostile work environment liability "depends on whether the [alleged] harasser [(in this case, Dyer)] is the victim[ ]s['] supervisor or merely a coworker."  Lewis, 368 Fed. Appx. at 31 (quoting Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 104 (3d Cir. 2009)).  GE/BHA would be

> subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee, . . . . [However, if] the perpetrator of the harassment is merely a co-employee of the victim, the employer w[ould] be held directly liable [only] if it knew or should have known of the harassing conduct but failed to take prompt remedial action.

Lewis, id. at 31 (quoting Miller, 277 F.3d at 1278) (quotation marks and citation omitted).

Thus, the plaintiffs can avoid summary judgment by offering sufficient evidence tending to demonstrate either that Dyer supervised the plaintiffs or that GE/BHA should have known of

the harassing conduct but failed to take prompt remedial action. Genuine issues of material fact remain with respect to both of these determinations.

The Eleventh Circuit has not defined who is a "supervisor" under either Title VII or Section 1981. Martinez v. Pavex Corp., 422 F. Supp. 2d 1284, 1294 (M.D. Fla. 2006). However, "[i]n the context of Title VII, a supervisor is generally considered an 'agent' of the employer," and "[t]he Eleventh Circuit has held that the term 'agent' should be liberally construed to effect Title VII's remedial purpose." Id. at 1294; Dinkins v. Charoen Pokphand USA, Inc., 133 F. Supp. 2d 1254, 1265 (M.D. Ala. 2001) (citing Urquiola v. Linen Supermarket, Inc., No. 94-14-CIV-ORL-19, 1995 WL 266582, at * 2 (M.D. Fla. 1995)). A sister court has held

> that an employee is a supervisor or "agent" for purposes of Title VII if he has the actual authority to take tangible employment actions, see [Burlington Indus., Inc. v. ]Ellerth, 524 U.S. [742,] 762 [(1988)], or to recommend tangible employment actions if his recommendations are given substantial weight by the final decisionmaker, see id., or to direct another employee's day-to-day work activities in a manner that may increase the employee's workload or assign additional or undesirable tasks, see Johnson [v. Booker T. Washington Broad. Serv.], 234 F.3d [508,] 513 [(11th Cir. 2000)].

Dinkins, 133 F. Supp. 2d at 1265. As noted in the joint-employer analysis, Plaintiffs present evidence that Dyer frequently interacted with/instructed and disciplined Lacy crew members directly and set the hours and break times for the Lacy crews when he was acting as TA on projects with Lacy Enterprises. In particular, Plaintiffs submit evidence that Dyer had the power to extend the plaintiffs' work day up to 16 hours. (See, e.g., Doc. 87-15, p. 1 (Reginald Richardson Decl. ¶ 4 ("Dyer told us how much to work. If he wanted the crew to finish a unit, he would make us work longer than the regular 12-hour day")); Doc. 87-20, p. 1 (Quincy Scott Decl. ¶ 8 ("Dyer told us at the beginning of the job how long our workshift would be . . . If Dyer

wanted to get the job done, he made the crew work 16 hours a day")); Doc. 87-8, p. 2 (Murphy Decl. ¶ 13) ("Dyer cursed at the crew when he found us taking breaks during the day or if we took a lunch break that lasted longer than half an hour")); Doc. 86-13, p. 2 (Green Decl. ¶ 9 ("Dyer told the crew when we could take lunch and when we could go back to the motel at the end of our shift. If Dyer wanted us to get more work done before we left for the day, he made us work after our shift was supposed to be over")). In addition, Plaintiffs offer evidence that Dyer "direct[ed the plaintiffs'] day-to-day work activities in a manner that [occasionally] increase[d] the employee's workload [and/or] assign[ed] additional or undesirable tasks." For example, Plaintiff Finklea stated that "Dyer told us to use hand tools to scrape out the dust in the units instead of using a vacuum truck. Using the vacuum truck to clean out the baghouse would have been faster and easier for the crew but Dyer insisted we do the job by hand." (Doc. 86-12, pp. 1-2 (Finklea Decl. ¶ 7); see also Doc. 87-8, p. 2 (Murphy Decl. ¶ 12) ("Dyer also cursed and yelled at our crew because he wanted us to work faster. If the job was supposed to take fifteen days, Dyer wanted us to finish in seven or eight days"). This evidence is sufficient to permit reasonable jurors to conclude that Dyer was a supervisor or agent for Title VII purposes. Accordingly, summary judgment cannot be granted on the ground that GE/BHA is not responsible for Dyer's alleged conduct.

Moreover, if Dyer was merely a co-worker, the determination of whether GE/BHA responded appropriately to the accusations against Dyer also presents issues of fact. An employer that "has knowledge of a racially combative atmosphere in the workplace[ ] has a duty to take reasonable steps to eliminate it." Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 72 (2d Cir. 2000) (citing Snell v. Suffolk Cnty., 782 F.2d 1094, 1104 (2d Cir. 1986)). Although "[a]n employer need not prove success in preventing harassing behavior in order to

demonstrate that it exercised reasonable care in preventing and correcting [ ] harassing conduct . . . if harassment continues after complaints are made, reasonable jurors may disagree about whether an employer's response was adequate." Id. (citing, inter alia, Richardson v. New York State Dep't Corr. Serv., 180 F.3d 426, 442 (2d Cir. 1999), abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006); and Carter v. Chrysler Corp., 173 F.3d 693, 702 (8th Cir. 1999)); see also Smith v. Auburn Univ., 201 F. Supp. 2d 1216, 1226 (M.D. Ala. 2002) (holding that genuine issues of material fact were raised regarding whether the employer took appropriate remedial action when, "beyond speaking with [the offender and threatening him with termination], nothing in the record suggest[ed] that [the employer] further investigated the scope of the problem" and the harassment persisted).

Plaintiffs present evidence that Ray Lacy accused Dyer of racism approximately eight months before GE/BHA instituted any systematic investigation, and that GE/BHA employees Lampe, Shupert, Collier, and Gooch were made aware of those accusations before the Buzzi job commenced. Plaintiffs also present evidence that Collier "defend[ed] Dyer" in the face of Ray Lacy's accusations, and that Gooch responded to them by saying "I don't want to hear it." Although there is evidence that, following Ray Lacy's April, 2007 accusations, Lampe requested "details about what was said, when, and who was involved from our representatives, including any documentation" and spoke of a "need to investigate," reasonable jurors may disagree about whether GE/BHA's response was adequate, particularly with respect to Ray Lacy's earlier accusations.

Finally, GE/BHA argues that Lacy Enterprises "had an affirmative responsibility to take corrective measures to protect Plaintiffs from harassment by a BHA employee." (Doc. 73-1, p. 51). Even assuming Lacy Enterprises does have such a duty, this argument is irrelevant. The

authorities cited by GE/BHA do not hold that one joint employer's duty to protect its employees relieves another joint employer of its responsibility for a hostile work environment.

### D. Section 1981 Retaliation Claim

"To establish a claim of retaliation under Title VII or section 1981,[12] a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events." Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1277 (11th Cir. 2008) (citing Burlington N. & Santa Fe Ry. Co., 548 U.S. at 59-71). As to whether the complaint is statutorily protected, "a plaintiff can establish a prima facie case of retaliation under the opposition clause of Title VII if he shows . . . that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, [and] also that his belief was *objectively* reasonable in light of the facts and record presented." Little v. United Technologies, Carrier Transicold Division, 103 F.3d 956, 960 (11th Cir. 1997).

If a prima facie case has been made, the defendant has an opportunity to show a legitimate non-retaliatory reason for its actions. Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998). If the defendant does so, the plaintiffs must show that the reasons the defendant gave were pretextual. Brochu v. City of Riviera Beach, 304 F.3d 1144, 1155 (11th Cir. 2002), modified on other grounds by D'Angelo v. School Bd. Of Polk City Fla., 497 F.3d 1203 (11th Cir. 2007).

GE/BHA challenges Plaintiffs' prima facie retaliation case by reasoning that: (a) Plaintiffs personally engaged in no conduct protected by Title VII; (b) Plaintiffs cannot maintain

---

[12] The Court notes that the amended complaint does not allege retaliation under Title VII.

a claim of retaliation based on Ray Lacy's conduct; and (c) Ray Lacy did nothing that qualifies for Title VII protection.  (Doc. 73-1, pp. 31-34).

Title VII states:  "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a).   Other courts have held that when an individual who is not himself the victim of an unlawful employment practice opposes such an employment practice on behalf of a victimized employee, the victimized employee is protected from unlawful retaliation notwithstanding the fact that the victimized employee did not personally oppose the unlawful employment practice.  See Allen Sherod *ex rel.* Stallworth v. Henry Cnty School Dist., Civil Action No. 1:05-CV-0600-JOF, 2007 WL 1020843 (N.D. Ga. 2007) (citing EEOC v. Ohio Edison Co., 7 F.3d 541, 545-46 (6th Cir. 1993) ("we believe that the phrase 'he has opposed any practice' should be construed broadly to mean 'he or his representative has opposed any practice,' because it is consistent with the objective of [Title VII] to prohibit retaliation against protected activity"); Baird v. Rose, 192 F.3d 462, 471, n. 10 (4th Cir. 1999).

Plaintiffs present evidence that Ray Lacy discussed Dyer's racist comments during the Alcoa job in the course of a conference call that Lacy arranged to defend a handful of Lacy Enterprises crew members whom Dyer and Lampe planned to send home from the job.  When Ray Lacy emailed Collier regarding Dyer's "racist comments and attitude" in August of 2006, Lacy explained that "the men resent it very much."  In his email to Lampe on April 23, 2007, Ray Lacy informed her that his "all black crew" was "livid about your and GE's attitude."  And on April 26, 2007, Ray Lacy wrote Lampe to relate "the opinion of [his] black crew members" and to explain that the plaintiffs "TOOK [Dyer's] abuse to keep their livelihoods."  From these

statements, there is sufficient evidence to conclude that Ray Lacy complained on behalf of the plaintiffs, who lacked a direct line of communication with GE/BHA management.

Moreover, GE/BHA's argument that Ray Lacy's statements were not specific enough to enjoy legal protection fails. "Internal complaints to supervisors concerning conduct that could reasonably be viewed as racially or sexually offensive plainly constitute protected expression under Title VII." Odom v. Mobile Infirmary, Civil No. 06-0511-WS-C, 2008 WL 748398, at *8 & n. 21 (Mar. 17, 2008) (citing inter alia, Pipkins v. City of Temple Terrace, Fla., 267 F.3d 1197, 1201 (11th Cir. 2001) ("[s]tatutorily protected expression includes internal complaints of sexual harassment to superiors")); Bradford v. Rent-A-Center East, Inc., 346 F.Supp.2d 1203, 1202 (M.D. Ala. 2004) ("plaintiff's casual statement in presence of supervisor that he was passed over before promotion because of race was protected expression under Title VII")).

Examining the record in the light most favorable to plaintiff, the Court finds that the plaintiffs have established both an objective and subjective belief that the reported activity was discriminatory. Moreover, the conduct of which Ray Lacy complained could reasonably be construed as racially offensive thus protected activity. Plaintiffs present evidence that Ray Lacy's comments during the conference call on the Alcoa job prompted Shupert to ask: "are you saying that Lynn Dyer is a racist?", to which Ray Lacy replied, "Mr. Dyer is harassing my men, and it must stop." In addition, Lampe stated in her deposition that Ray Lacy's April 23, 2007 comment "about libelous remarks about me and the all black crew" prompted her to conclude that Ray Lacy was alleging that someone at GE had made racial comments. These responses suggest that Ray Lacy's complaints were specific enough to prompt GE/BHA supervisors to conclude that they concerned racist conduct. Also, during the Alcoa job, Ray Lacy informed Collier that Dyer had "had his racist comments and attitude from day one" and that Dyer's

"attitude towards blacks was not acceptable."  In the midst of the Buzzi job, Ray Lacy told

Gooch that "Lynn Dyer was acting in a racist and harassing manner towards African-Americans

on these crews" and advised Collier that Dyer was working the Lacy Enterprises crew hard

because Dyer was "a racist" who "hate[d] blacks and won't work with them."  Finally, on April

26, 2007, Ray Lacy stated that "Lacy Enterprises [could ]not continue to see [his black crew

members] discriminated against."

GE/BHA also move for summary judgment on the ground that they have legitimate, non-

discriminatory reasons for not assigning work to Lacy Enterprises and thus to Plaintiffs, and that

there is no evidence that GE/BHA's articulated reasons for not offering work to the plaintiffs are

pretextual.  (See Doc. 73, pp. 34-43).  According to GE/BHA, it

> offered no new projects to Enterprises for two reasons.  First,
> Enterprises was hurting BHA's relationship with its customers.
> Buzzi was the worst project ever, Ray Lacy blamed the Buzzi
> problems on BHA for giving him too much work, and Mr. Lacy
> decided to "cut all ties" with GE.  Second, baghouse business
> dropped off dramatically in 2007 to the point that BHA did not
> think it could entrust what limited work it was getting to an
> Enterprises crew.

(Id., p. 44).

In considering whether an employer's reasons were pretextual, "The district court must

evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons

for its action that a reasonable factfinder could find them unworthy of credence.  Combs v

Plantation Patterns, Meadowcraft, Inc., 106 F.3d 1519, 1528 (11th Cir. 1997).  In seeking to

demonstrate pretext, "[t]he employee may rely on evidence that he already produced to establish

his prima facie case."  Martin v. Brevard Cnty Pub. Schs., 543 F.3d 1261, 1268 (11th Cir. 2008)

(citing <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1528 (11th Cir. 1997); <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 921 (11th Cir. 1993)).

Plaintiffs present evidence of pretext sufficient to allow a reasonable factfinder to find the proffered legitimate reasons unworthy of credence. GE/BHA's first stated rationale—that Plaintiffs' poor performance on the Buzzi project prompted Ray Lacy to "cut all ties" with GE/BHA and required GE/BHA to protect their customer relations by ceasing to work with the plaintiffs—is undermined by the fact that GE/BHA continued to work with Lacy Enterprises on five jobs following Buzzi. GE/BHA's second rationale—that baghouse business "dropped off dramatically" in 2007 such that "BHA did not think it could entrust what limited work it was getting to an Enterprises crew"—is contradicted by the statements of GE/BHA employees Chen, Winter, O'Conor, and Gooch. On April 27, 2007, immediately following Lacy's April 26 email and a little more than a week and a half before he authorized Lacy Enterprises' suspension, Chen, GE/BHA's Sourcing Leader, responded to an inquiry about Lacy Enterprises' "ability to do the work relative to other suppliers" by noting that "[i]n general, we would like to have more labor supplier capacity." Less than a month later, Winter wrote a group of GE/BHA management with concerns over the "[d]emise of Lacy." Specifically, Winter wanted to make sure that the decisionmakers "[understood] the ramifications . . . prior to making th[e] decision" not to use Lacy. Winters estimated that Lacy represented "approximately $800,000 in top-line sales per year[, . . .] not tak[ing] into account Lacy's involvement outside of their region[, which] easily put[ ] this number over $1,000,000. To meet goal, we needed $1.2M out of them this year." Winter went on to note that "[i]n this time we are looking to grow this business by 53%, we have lost 2 prime contractors representing 45,000 of our required 90,000 labor hours . . . ." O'Conor pointed out in response to Winter's email that ceasing to work with Lacy would require

the group to "adjust goal since we'll be unable to meet consumer demand." Rather than pointing out that baghouse business was "dropp[ing] off dramatically," Chen responded to Winter and O'Conor's concerns by explaining that "[t]he reason for the temporary suspension is sensitive." According to Chen, by "sensitive" he had in mind "the threat of litigation," and he advised the group that if General Counsel Scott Blair was able to "resolve[ the situation] successfully," the defendants could "work with [Lacy Enterprises] again." Finally, Gooch estimated in his deposition that GE/BHA's baghouse revenue dropped by approximately $100,000 to $200,000 between 2006 and 2007 (from approximately $3.6-$3.7 million in 2006 to $3.5 million in 2007). That relatively small decline—at most 5 percent of GE/BHA's estimated baghouse revenues— along with the fact that, per Winter's estimates, Lacy Enterprises accounted for between $800,000 and $1.2 million worth of yearly revenue, suggests that GE/BHA's baghouse business may have improved rather than declined during 2007. Plaintiffs' pretext argument is also supported by evidence that, at the time GE/BHA decided to suspend Lacy Enterprises, GE/BHA was actually "looking to grow th[e] business by 53%." Accordingly, Plaintiffs have presented sufficient evidence of pretext to avoid summary judgment.

### E. Discriminatory Discharge Claims

In the absence of direct evidence of discrimination, courts assessing disparate treatment claims on summary judgment apply the familiar burden-shifting analysis of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973). In order "to prove discriminatory treatment through circumstantial evidence: (1) a plaintiff must first make out a *prima facie* case[;] (2) then the burden shifts to the defendant to produce legitimate, nondiscriminatory reasons for the adverse employment action[;] and (3) then the burden shifts back to the plaintiff to establish that these

reasons are pretextual." Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1375 (11th Cir. 1996) (internal citations omitted).

To make out a prima facie case of discriminatory discharge, the plaintiffs must show that "(1) [they are] member[s] of a protected class; (2) [they were] qualified for the position[s they held]; (3) [they each] suffered an adverse employment action; and (4) [they were] replaced by . . . a person[/persons] outside [the] protected class or w[ere] treated less favorably than a similarly-situated individual[/individuals] outside [their] protected class." Maynard v. Bd. of Regents of the Div. of Univ. of the Fla. Dep't of Educ., 342 F.2d 1281, 1289 (11th Cir. 2003) (citing McDonnell Douglas Corp., 411 U.S. at 802).

For the purposes of summary judgment, GE/BHA "assum[es] that Plaintiffs . . . can establish a prima facie case" of discriminatory discharge."[13] (See Doc. 73, p. 43). Instead, GE/BHA moves for summary judgment on the grounds that it has legitimate, non-discriminatory reasons for not assigning work to Lacy Enterprises and thus to Plaintiffs. GE/BHA asserts the same rationale in connection with both the discriminatory discharge and retaliation claims. (See

---

[13] GE/BHA, however, mentions in a footnote that "Plaintiffs' prima facie discriminatory discharge case is weakest with respect to the 'discharge' element . . . . [because] Plaintiffs' baghouse work was seasonal and episodic . . . [,] so the vast majority of Plaintiffs were not doing baghouse work in 2007." (Doc. 73-1, p. 43). GE/BHA has failed to sufficiently develop this argument in a fashion that would permit the Court to award them summary judgment.

In the reply brief, GE/BHA mentions that that there is no evidence that Roff Iron's crews are all white and that there is no evidence that GE/BHA sent more work to Roff Iron. (See Doc. 93, p. 29). This argument appears to be offered in response to Plaintiffs' arguments relating to the discriminatory discharge claims. (See id.). In the opposition brief, Plaintiffs mention Roff Iron in the context of discriminatory discharge in response to what they characterize as GE/BHA's "suggest[ion that] Plaintiffs cannot show pretext, in part because GE/BHA had a long-standing relationship with the African-American plaintiffs." (See Doc. 83, p. 58). Because the Court concludes the other evidence of pretext Plaintiffs offer is sufficient to cast doubt on the reasons GE/BHA offers for its actions, and because the GE/BHA explicitly "assum[ed]" for the purposes of summary judgment that Plaintiffs could establish a case of discriminatory discharge, the undersigned considers irrelevant the argument that there is no evidence of Roff Iron's allegedly all-white crews.

Doc. 73-1, p. 44).  GE/BHA further argues that there is no evidence that GE/BHA's articulated reasons for not offering work to the plaintiffs are pretextual.  (See Doc. 73, pp. 44-45).

For the reasons set forth in the analysis of the retaliation claims, the Court concludes that Plaintiffs have presented sufficient evidence of pretext to avoid summary judgment on their discriminatory discharge claims.

### F.  Statute of Limitation Issues

GE/BHA summarily claims in a footnote that thirteen plaintiffs are time-barred from asserting Title VII claims, as these plaintiffs have not performed work for Enterprises since 2005 or before.  (See Doc. 73-1, n. 6).  GE/BHA cites no legal authority in support of this claim and has failed to sufficiently develop its argument, particularly as it pertains to the Section 1981 claims.  Accordingly, the Court will not address this issue.

## III.  Conclusion

For the foregoing reasons, GE/BHA's motion for summary judgment (Doc. 73) is **DENIED**.

**DONE** and **ORDERED** this the **2nd** day of **November, 2010.**

s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**